Bradenton D

WACEPF

# ITFS EXCESS CAPACITY AIRTIME LEASE AGREEMENT

**Bradenton, FL**

**November 14, 1991**

EXHIBIT

B

**TABLE OF CONTENTS**


1. TERM OF AGREEMENT . . . . . 3
   - A) Initial Term . . . . . 3
   - B) Renewal Term . . . . . 3
   - C) New Lease Agreement/Right of First Refusal . . . . . 3
   - D) Operation During End of Term . . . . . 6
   - E) No Rights Beyond Term of Licenses . . . . . 6

2. ALLOCATION OF AIRTIME . . . . . 7
   - A) Excess Capacity Airtime . . . . . 7
   - B) Lessor's Primary Airtime . . . . . 7
   - C) Lessor's Ready Recapture Airtime . . . . . 8
   - D) Schedule of Airtime . . . . . 8
   - E) Change of Schedule . . . . . 8
   - F) Use of Vertical Blanking Intervals . . . . . 8
   - G) Lessor's Increase in Scheduling . . . . . 9
   - H) Significant Reduction in Lessee Airtime . . . . . 9
   - I) Lessor's Use of ITFS Channels . . . . . 11
   - J) Expanded System Capacity . . . . . 12

3. TRANSMISSION SITE AND FACILITIES . . . . . 12
   - A) Transmission Site . . . . . 12
   - B) System Construction . . . . . 13
   - C) Maintenance of Transmission Equipment . . . . . 14
   - D) Transmission of Programming . . . . . 14
   - E) Interference . . . . . 14
   - F) Alterations and Attachments . . . . . 15
   - G) Increase In Authorized Transmission Power Requirements . . . . . 15
   - H) Licensee Control and Liability . . . . . 16
   - I) Studio to Transmitter Link . . . . . 16

4. LESSOR'S RECEIVE SITES . . . . . 16

5. LEASE OF EQUIPMENT . . . . . 17
   - A) Lessor's Lease of Leased Equipment . . . . . 17

6. FEES . . . . . 18
   - A) Lessor's Service Fee . . . . . 18
   - B) Lessee's Transmission Fee . . . . . 18
   - C) Subscriber Royalty Fees . . . . . 18
   - D) Notice of Construction and Operation; Required Certificate. . . . . . 19
   - E) Right to Audit . . . . . 19

7. PROGRAMMING . . . . . 20
   - A) Control Over Programming . . . . . 20
     - 1) Program Content . . . . . 20
     - 2) Right to Delete . . . . . 21
   - B) Availability of Programming . . . . . 21
   - C) Carriage of EWTN . . . . . 23
   - D) Integration of Lessor's Programming . . . . . 23
   - E) Station Identification . . . . . 24

8. PROSECUTION OF PETITIONS, AUTHORIZATIONS AND LICENSES . . . . 24
A) Best Efforts to Secure Approval of this Agreement . 24
B) Further Efforts . . . . . . . . . . . . . . . . . . . 25
C) Attorneys Fees . . . . . . . . . . . . . . . . . . . 25

9. REPRESENTATIONS AND WARRANTIES. . . . . . . . . . . . . . . . 25
A) Representations and Warranties of Lessor. . . . . . 26
1) Organization. . . . . . . . . . . . . . . . . . 26
2) No Violation. . . . . . . . . . . . . . . . . . 26
B) Representations and Warranties of Lessee. . . . . . 26
1) Organization. . . . . . . . . . . . . . . . . . 26
2) Corporation Action; Valid and Binding Agreements. . . . . . . . . . . . . . . . . . . 27
3) Litigation and Investigations. . . . . . . . . 27
4) Misrepresentation of Material Fact. . . . . . . 27
C) Survival or Representations and Warranties. . . . . 28

10. TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . 28
A) Termination of FCC Authorization . . . . . . . . . . 28
B) Termination by Reason of Default . . . . . . . . . . 28
C) Remedies to Continue . . . . . . . . . . . . . . . . 29

11. TRANSFER OF RIGHTS AND OBLIGATIONS . . . . . . . . . . . . . 29

12. START DATE . . . . . . . . . . . . . . . . . . . . . . . . . 30

13. INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . 30
A) By Lessor . . . . . . . . . . . . . . . . . . . . . 30
B) By Lessee . . . . . . . . . . . . . . . . . . . . . 31
C) Notice of Claim; Defense of Claim . . . . . . . . . 31

14. INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . 32
A) Policies Required . . . . . . . . . . . . . . . . . 32
B) Insurance Policy Forms . . . . . . . . . . . . . . . 32
C) Proof of Insurance . . . . . . . . . . . . . . . . . 33

15. RELATIONSHIP OF PARTIES . . . . . . . . . . . . . . . . . . 33

16. OPTIONS TO PURCHASE EQUIPMENT. . . . . . . . . . . . . . . . 33
A) Lessor's Option to Purchase . . . . . . . . . . . . 33
B) Lessee's Option to Purchase . . . . . . . . . . . . 34

17. NON-DISCLOSURE . . . . . . . . . . . . . . . . . . . . . . . 34

18. NON-COMPETITION . . . . . . . . . . . . . . . . . . . . . . 35

19. FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . 35

20. CONDITION PRECEDENT . . . . . . . . . . . . . . . . . . . . 35

21. NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

22. SEVERABILITY . . . . . . . . . . . . . . . . . . . . . . . . 36

23. WAIVER . . . . . . . . . . . . . . . . . . . . . . . . . . 36
24. PAYMENT OF EXPENSES . . . . . . . . . . . . . . . . . . . . . 36
25. VENUE AND GOVERNING LAW . . . . . . . . . . . . . . . . . . . 37
26. COUNTERPARTS . . . . . . . . . . . . . . . . . . . . . . . . 37
27. ENTIRE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . 38

**ITFS EXCESS CAPACITY AIRTIME LEASE AGREEMENT**

THIS AGREEMENT, is made this _____ day of _______________, 19__ by North American Catholic Educational Programming Foundation, Inc. (hereinafter referred to as "Lessor") having its principal place of business at P.O. Box 40026, Providence, RI 02940-0026 (overnight mail - 47 Meadowview Blvd., N. Providence, RI 02904) and American Telecasting, Inc. (hereinafter referred to as "Lessee") having its principal place of business at 812 South Tejon Street, Colorado Springs, CO 80903.

WHEREAS, the Federal Communications Commission ("FCC") has authorized licenses for Instructional Television Fixed Service ("ITFS") channels and has authorized the licensee to lease excess capacity to non-ITFS users; and

WHEREAS, Lessor intends to be the applicant for and become the holder of licenses or construction permits issued by the FCC for the operation of four (4) ITFS Channels as designated by subpart I of Part 74 of the FCC's rules in the Bradenton, Florida Metropolitan Area ("The Metropolitan Area").

WHEREAS, Lessee is in the business of providing subscription television programming to its paying customers via microwave transmission known as Wireless Cable and is desirous of leasing excess ITFS capacity; and

WHEREAS, Lessee believes that practical adjacent channel operation of the ITFS spectrum is feasible and the parties agree that any of the above referenced ITFS Channels licensed or granted to Lessor by the FCC in the band 2500 - 2700 MHz, whether interleaved, adjacent, or non-contiguous are encompassed by this

Agreement. As used herein, the phrase "ITFS Channels" shall mean the entire spectrum of frequencies in the band 2500-2700 MHz which are licensed to Lessor.

WHEREAS, Lessee intends to enter into other ITFS, Operational-Fixed Microwave Service ("OFS"), Multipoint Distribution Service ("MDS"), or Multichannel Multipoint Distribution Service ("MMDS") channel leases with other licensees and applicants in the Metropolitan Area so as to increase the number of channels of programming Lessee is able to deliver to its subscribers. The network of co-located channels thus created shall hereinafter be described as "Lessee's System".

WHEREAS, Lessor has determined that there will be excess airtime capacity available on the ITFS Channels utilized for Lessor's educational needs and that this excess airtime capacity is available for commercial programming. Lessor has further determined that by combining its educational programming with Lessee's commercial programming, a significant increase may be achieved in the number of persons who will have access to Lessor's educational programming at little or no additional cost. Since the dissemination of educational programming is significantly increased as a result of the integrated system, it is consequently determined that each channel is being used for ITFS purposes in serving the good of the public.

NOW THEREFORE, in consideration of the mutual promises, undertakings, covenants and conditions set forth herein, the Lessor and Lessee do hereby agree and warrant as follows:

1. TERM OF AGREEMENT.

A) Initial Term. This Agreement shall be effective upon the date of its execution and the term shall begin on the Start Date as defined in Paragraph 12 hereof and extend for an initial period of five (5) years. Such period is hereinafter referred to as the "Initial Term".

B) Renewal Term. Provided Lessee's rights have not been terminated pursuant to Paragraph 9(a), this Agreement shall automatically and without further notice be extended for one (1) additional term (such additional term is hereinafter referred to as the "Renewal Term") of five (5) years unless and until Lessee shall have served written notice on Lessor at least sixty (60) days prior to the expiration date of the Initial Term that Lessee elects not to renew this Agreement for the Renewal Term. It is acknowledged and agreed that Lessee shall have the absolute right not to renew this Agreement notwithstanding any provision hereof to the contrary.

C) New Lease Agreement/Right of First Refusal. Providing that Lessor's FCC license remains in good standing and/or Lessor seeks to renew such license, Lessee and Lessor shall enter into discussions and potential negotiations for a new excess capacity airtime lease agreement (hereinafter referred to as "New Lease Agreement") no later than two hundred seventy (270) days prior to the end of the Renewal Term. If Lessor elects to not reasonably pursue a New Lease Agreement with Lessee, then Lessor shall so notify Lessee in writing of such intent no later than one hundred

eighty (180) days prior to end of the Renewal Term. If Lessor and Lessee do not enter into a New Lease Agreement, Lessor grants Lessee a right of first refusal on any competing proposals for lease agreements or transfers or assignments of any part of the ITFS Channels received by Lessor until twelve (12) months after the expiration of the Renewal Term. If any acceptable offer to lease or acquire the ITFS Channels is made to Lessor, Lessor shall give written notice to Lessee describing the person to whom the proposed lease or transfer is to be made, the fees, charges, rental or other consideration to be received for the lease or transfer, the terms thereof and generally the relevant other terms and conditions of the lease or transfer. Lessee shall have a period of thirty (30) days after its receipt of such notice from Lessor in which to elect, by giving written notice to Lessor, to lease or, if eligible, obtain any or all of the ITFS Channels for the same fees, charges, rental or other consideration for which Lessor proposed to lease or transfer to the third person.

If the fees, charges, rental or consideration to be paid by such third person are to be in whole or in part in a form other than cash, the consideration to be paid by Lessee shall be in cash in an amount fairly equivalent to the fair value of the consideration payable by the third person and shall be so stated by Lessee as a sum certain in its notice of election.

If Lessor does not believe Lessee's stated offer is in an amount fairly equivalent to the fair value of the consideration

payable by the third person and so notifies Lessee in writing within seven (7) days after Lessor's receipt of Lessee's notice of election to so lease or purchase, Lessee may within five (5) days after its receipt of such notice from Lessor elect to refer such question for determination by an impartial arbitrator and the right of first refusal of Lessee shall then be held open until five (5) days after Lessee is notified of such determination. Such arbitrator shall be chosen either by agreement of Lessee and Lessor at the time such question arises, or, at the option of either party, by referring the question to the American Arbitration Association with instructions that the American Arbitration Association select a single arbitrator under a request from the parties for expedited and accelerated determination. The determination of the arbitrator chosen under either option contained in this subparagraph shall be final and binding upon Lessee and Lessor. The parties shall share equally in the costs and fees of the Arbitration.

In the event Lessee shall elect to exercise its right of first refusal, the lease agreement or other transfer or assignment shall be consummated within thirty (30) days of the latest of: (1) the day on which Lessor received notice of Lessee's election to exercise the right of first refusal; (2) the day upon which any question required to be determined by the arbitrator hereunder has been determined; or (3) the date of any FCC approval in the case of assignment or transfer; or at such other time as may be mutually agreed. The right of first refusal

is terminated either by the lease or other transfer to Lessee as provided herein or by notice to Lessee of the Lessor's proposal to lease or otherwise transfer the ITFS Channels or any part to a third person and Lessee's unwillingness or failure to meet and accept such a bona fide offer pursuant to the times and procedures as set forth above; provided that such proposed lease or transfer is consummated at the same fees, charges, rental or other consideration and upon the same terms as to which such right of first refusal applied, within thirty (30) days after Lessee's right of first refusal had expired or had been specifically waived by written notice given to Lessor by Lessee, or within thirty (30) days following FCC approval in the case of assignment or transfer.

D) Operation During End of Term. If Lessor and Lessee do not enter into a New Lease Agreement before the end of the Renewal Term, Lessee shall cease leasing the ITFS Channels on the last day of the Renewal Term.

E) No Rights Beyond Term of Licenses. Lessor and Lessee agree that this Agreement shall not give rise to any rights or remedies beyond the expiration of any FCC license necessary for the continued operation of the ITFS Channels, whether such expiration occurs during the Initial Term or the Renewal Term. Provided, however, that while this Agreement is in effect, Lessor shall obtain and maintain in force all licenses, permits and authorizations required or desired in connection with the use of the ITFS Channels. Lessor shall take all necessary steps to

renew the licenses for the ITFS Channels and shall not commit any act or engage in any activity which could reasonably be expected to cause the FCC to impair, restrict, revoke, cancel, suspend or refuse to renew the ITFS licenses. Lessor shall take all reasonable steps to comply with the Communications Act of 1934, as amended and the rules and regulations of the FCC, and shall timely file all reports, schedules and/or forms required by the FCC to be filed by Lessor. In accordance with Paragraph 8, all expenses, including attorneys fees and filing fees, incurred in preparing and filing such reports, schedules and/or forms required by the FCC shall be paid by the Lessee.

2. ALLOCATION OF AIRTIME.

A) Excess Capacity Airtime. To the extent allowed by the FCC rules and regulations and any amendments thereof, Lessor agrees to lease to Lessee the exclusive use of all excess capacity airtime on Lessor's ITFS Channels as more fully set forth herein. As used in this Agreement, the phrase "Excess Capacity Airtime" means all airtime on the ITFS Channels apart from "Lessor's Primary Airtime" and when applicable "Lessor's Ready Recapture Airtime" and "EWTN Airtime."

B) Lessor's Primary Airtime. Lessor reserves for each channel licensed the minimum number of hours of airtime each week (Monday through Saturday) required by the FCC rules to be used for its ITFS scheduled programs aired between the hours of 8:00 a.m. and 10:00 p.m.; provided however, that such reserved airtime include a minimum of three (3) hours per weekday (Monday through

Friday) excluding Holidays and vacation days except during the first two (2) years of operation when the maximum number of hours of ITFS programming that qualifies toward the twelve (12) hour weekly minimum is four (4) hours per day. This airtime shall be known as "Lessor's Primary Airtime".

C) Lessor's Ready Recapture Airtime. For any expanded ITFS programming needs, Lessor also preserves additional hours of airtime each week (Monday through Saturday) up to forty (40) total hours for each licensed channel between the hours of 8:00 a.m. and 10:00 p.m. to transmit qualified ITFS programming; provided however, that such preserved airtime include a minimum of three (3) hours per weekday (Monday through Friday), excluding Holidays and vacation days. This airtime shall be known as "Lessor's Ready Recapture Airtime".

D) Schedule of Airtime. The schedule which depicts the agreement of the parties as to the use of Lessor's Channels shall be attached hereto and made a part hereof as Exhibit A within thirty (30) days of the grant of a conditional license to Lessor.

E) Change of Schedule. There shall be no economic or operational detriment borne by Lessor arising from its use of Lessor's Ready Recapture Airtime. Lessor agrees to provide Lessee with ninety (90) days notice of any intent to use Lessor's Ready Recapture Airtime or modify the Schedule of Airtime.

F) Use of Vertical Blanking Intervals. Lessee shall at all times have the right to use the vertical blanking intervals, associated subcarriers and response channels (collectively referred to hereinafter as the "VBI") to the extent necessary for

scrambling and descrambling purposes. During Excess Capacity Airtime, Lessee shall have the exclusive right to use the VBI of the ITFS Channels. During Lessor's Primary Airtime or Ready, Recapture Airtime, Lessor reserves for its exclusive use the VBI of its ITFS Channels subject to Lessee's use for scrambling and descrambling purposes as noted above.

G) Lessor's Increase in Scheduling. Lessor acknowledges that a significant capital expenditure is to be made by Lessee for the mutual benefit of the parties to this Agreement. Lessor expressly agrees to use its best efforts to take no action which would jeopardize the ability of Lessee to fully recover its investment through its provision of services contemplated by this Agreement. In this regard, it is acknowledged that Lessor's primary purpose for Airtime use is to provide accredited educational programming. In the event that Lessor seeks to broadcast accredited ITFS educational programming other than during Lessor's Primary Airtime or Lessor's Ready Recapture Airtime thereby reducing Lessee's Excess Capacity Airtime to less than one hundred twenty-eight (128) hours per week (Monday-Sunday) per channel, Lessor shall provide Lessee with one hundred twenty (120) days notice of this intent. Except as noted in Paragraph 7(c), any such reduction of Lessee's Excess Capacity Airtime shall hereinafter be referred to as a "Significant Reduction in Lessee's Airtime".

H) Significant Reduction in Lessee Airtime. In the event a Significant Reduction in Lessee's Airtime occurs, Lessee shall have each of the following three rights, each of which may be exercised from time to time during this Agreement without

prejudice to Lessee's subsequent exercise of another of these rights.

i) If the additional ITFS programming sought to be broadcast by Lessor may be broadcast during unscheduled Airtime on Lessee's System, Lessee shall so notify Lessor and the ITFS programming shall be broadcast during that time period. Also if Lessee presents Lessor with other methods of reasonably accommodating Lessor's increased scheduling needs, then Lessor agrees to use its best efforts in cooperating with Lessee to implement those other methods.

ii) Lessee shall also have the right to require Lessor to file for a license modification with the FCC for the technical channel expansion of one or more of the ITFS Channels by use of Comband (TM) or any other broadcast system approved by the FCC. The expanded channels thereby created shall be referred to hereinafter as "The Expanded Channels". Upon approval by the FCC of such license modification, Lessee agrees, at its expense, to purchase and install all equipment necessary to complete such license modification. Any equipment so used in such construction shall be leased to Lessor pursuant to Paragraph 5 hereof. Once the Expanded Channels have been constructed, they shall automatically and without further amendment be considered a part of this agreement and subject to all terms and conditions hereof. The allocation of time over the Primary and Expanded Channels shall comply with the FCC's rules so as to fulfill Lessor's ITFS programming requirements that gave rise to the Significant Reduction of Lessee's Airtime. In so doing, the parties shall use their best efforts to minimize the additional capital costs

to be incurred by Lessee as the result of the construction of the Expanded Channels.

iii) Lessee may at any time terminate this agreement without penalty or further liability to Lessor upon notice to Lessor. Alternatively, Lessee may reduce in proportionate amount the amount of transmission fees and subscriber royalty fees payable under the provisions of Paragraphs 6(B) and 6(C) of this Agreement during the remainder of the terms of this Agreement.

I) Lessor's Use of ITFS Channels. Lessor recognizes the mutual benefits and technological advantages of the use of encoding methods for program security, equipment signaling and individual addressability control over unauthorized equipment use. Lessor agrees that its program services and airtime use will not harm or interfere with Lessee's current or future signal paths utilized within Lessee's System for program encryption, pilot carrier signaling and other technical needs utilized for the operation of and such services provided by Lessee's System. Also, Lessor will not, by its own action, or through a third party, utilize any part of its licensed frequency spectrum to create or operate a service that is in competition with current, planned or future services provided by Lessee's System.

J) Expanded System Capacity. Lessee shall have the right at anytime to require Lessor to file with the FCC any necessary application to expand the channel capacity to Lessor's station to enable it to carry more than one video signal per channel; provided however, before Lessee can exercise this right, it must demonstrate to the Lessor's reasonable satisfaction that such modification will not materially degrade the performance of the

station nor impair signal quality at the ITFS receive points. Once such modification has been constructed, the modified facilities shall automatically be considered a part of this agreement and subject to all terms and conditions hereof; provided however, that the transmission fee and subscriber royalty fee payable to Lessor under the provisions of Paragraphs 6(b) and 6(c) of this Agreement shall be increased in a proportionate amount equal to the increased number of channels available to Lessee under this paragraph. For purposes of calculating any such proportionate increase, the parties acknowledge and agree that the transmission fee and subscriber royalty fee agreed to herein are based on Lessee's equivalent use of three full-time ITFS Channels. It is understood that Lessee shall have the full time use of the Expanded Channels to the extent permitted by FCC rules.

3. TRANSMISSION SITE AND FACILITIES.

A) Transmission Site. Upon execution of this Agreement, Lessee and Lessor shall together select a mutually acceptable location for the Transmission Site for the provision of the services contemplated by this Agreement. This site shall hereinafter be described as the "Transmission Site". At Lessee's sole expense, Lessee shall contract for a lease of space at the Transmission Site upon such terms as the parties agree. The Transmission Site shall comply with the standards, specifications and regulations of the FCC rules and orders pertaining to Lessor's ITFS license. At Lessee's sole expense pursuant to Paragraph 8, Lessor shall file the appropriate applications with the FCC to secure authorization to operate the ITFS Channels from

the Transmission Site. If upon reviewing Lessor's ITFS application the FCC directs Lessor to amend its application, including the terms and conditions of this Agreement, in order to bring the application in compliance with FCC regulations and guidelines for a conditional construction permit or license, the parties shall immediately negotiate in good faith toward the necessary revisions. Again at Lessee's sole expense pursuant to Paragraph 8, Lessor shall file such agreed revisions to its FCC applications. If the parties hereto cannot agree upon such revisions, then this Agreement shall be terminated without further liability.

B) System Construction. Upon issuance by the FCC of an authorization for the ITFS Channels at the Transmission Site, Lessee shall within a reasonable period of time, but not later than nine (9) months thereafter, begin construction of the ITFS Channel transmission facilities. At its expense, Lessee shall purchase and install such transmitters, transmission line, modulators, antennas and other equipment as required to operate the ITFS Channels in accordance with the provision of such authorization. Any equipment so used in such construction shall be leased to Lessor pursuant to Paragraph 5 hereof. Such equipment is hereinafter referred to as the "Leased Equipment". Lessee further agrees throughout the term of this Agreement to provide Lessor with sufficient space at the Transmission Site for any equipment required to provide for Lessor's audio and video transmission needs for its ITFS programming. Lessee shall retain title to the Leased Equipment except as noted by Paragraph 15 herein.

C) Maintenance of Transmission Equipment. At Lessor's expense and subject to Lessor's right to supervise the maintenance of this equipment, Lessee shall maintain and operate the Leased Equipment during the terms of this Agreement for a nominal fee. Lessee shall also pay all taxes and other charges assessed against the Leased Equipment.

D) Transmission of Programming. At no cost or expense to Lessor, Lessee shall provide the necessary labor to transmit on the ITFS Channels all programming required to be carried pursuant to this Agreement such as Lessor's ITFS programming and EWTN. Such labor shall include, but not be limited to, the transmission of tapes provided by Lessor, the reception and recording of satellite delivered programming and the transmission of recorded programming. Subject to reasonable notice, Lessee shall also comply with Lessor's reasonable instructions regarding the transmission of such programming such as the dates and times to transmit programming in accordance with the Schedule of Airtime (Exhibit A) attached hereto and updated from time to time.

E) Interference. Lessee shall operate the Leased Equipment so that such operation does not create or increase interference with electronic transmission of any other FCC licensees entitled to protection under FCC rules and regulations. If Lessee's operation of the Leased Equipment does so create or increase interference, Lessee shall pay all of the reasonable engineering and legal fees necessary to resolve the interference problem so created.

F) Alterations and Attachments. Lessee, at its own expense, may make alterations of or attachments to the ITFS

Equipment or the Common Equipment (including the installation of encoding and/or addressing equipment) as may be reasonably required from time to time by the nature of its business; provided however, that such alterations or attachments do not interfere with Lessor's signal or ongoing operations or violate any FCC rules or regulations; and provided further that FCC authorization, if required, is obtained in advance of any such alteration or attachment at the sole cost of Lessee. To the extent any FCC authorization pertaining to the ITFS Equipment is required, Lessor agrees to use its best efforts to obtain such authorization.

G) Increase In Authorized Transmission Power Requirements. If Lessee determines during the term of this Agreement that an increase in transmitter power is reasonably necessary to better serve Lessee's customers and those of Lessor, Lessor shall execute the necessary applications to achieve such increased transmitter power. Lessee shall, at its cost, perform such re-engineering studies as may be reasonably necessary and, upon completion of such re-engineering studies, Lessor shall, at Lessee's cost, file the appropriate applications with the FCC to secure approval for such increased transmitter power. Upon approval of any such application by the FCC, Lessee shall at its expense forthwith commence to upgrade the ITFS Channel transmission facilities in accordance with such FCC authorization.

H) Licensee Control and Liability. Nothing herein shall derogate from such licensee control of operations of the ITFS Channels that Lessor, as an FCC licensee, shall be required to

maintain and Lessee acknowledges the reservation by Lessor of such control. Lessor shall at all times retain ultimate and exclusive responsibility for the operation and control of the ITFS Channels including policy decisions.

I) Studio to Transmitter Link. In the event that the Transmitter Site is at a location removed from Lessee's studio or other operating facilities, Lessee shall, subject to FCC approval and at its sole cost and expense, provide a Studio to Transmitter Link (hereinafter referred to as an "STL") for transmitting Lessor's ITFS programming from Lessee's studio or other operating facilities to the Transmission Site. If requested by Lessee, Lessor shall apply to the FCC for approval of the STL, however, Lessee shall be responsible for all expenses and costs incurred in obtaining an FCC authorization. Upon installation and commencement of operation, Lessee shall lease such STL to Lessor at an annual rental of one dollar ($1.00) for the duration of this Agreement. Operation of such STL shall be in the sole control of Lessor or as otherwise required by the FCC.

4. LESSOR'S RECEIVE SITES.

Upon the filing of the ITFS application, there shall be attached hereto and incorporated herein as Exhibit B a copy of FCC Form 330, Section IV listing the receive sites designated by Lessor to receive its ITFS programming. Each receive site designated by Lessor, up to a maximum of twelve (12) sites, shall be installed at the expense of Lessee with a Standard Installation and Lessee shall provide up to five (5) standard television receivers ("TVs") and five (5) video cassette

recorders ("VCRs") to Lessor for distribution to receive sites; provided however, that the total cost for the Standard Installations at all such receive sites, the TVs and VCRs does not exceed ten thousand dollars ($10,000.00). If as the result of any relocation of the Transmit Site, the equipment at Lessor's existing receive site must be reoriented, Lessee shall pay the cost of same. As used herein for the purposes of this Agreement, the phrase "Standard Installation" shall consist of the following: (i) the placement of the ITFS/MMDS receiving antenna at an elevation (not to exceed thirty (30) feet above the base mounting location), which could normally receive the line of sight transmission from the Transmission Site, (ii) the coupling thereto of a block down converter and (iii) a sufficient amount of transmission line (coaxial cable) to connect the received ITFS programming to either each classroom designated by Lessor to receive the ITFS programming or the receive site's internal distribution system.

5. <u>LEASE OF EQUIPMENT</u>.

A) <u>Lessor's Lease of Leased Equipment</u>. For a nominal fee, Lessor shall lease from Lessee the Leased Equipment during the terms of this Agreement. A list of this equipment is attached hereto as Exhibit C and incorporated by reference herein. Lessor shall have no responsibility for the loss of or damage to the Leased Equipment during the terms of this Agreement and Lessee shall bear all such responsibility.

6. <u>FEES</u>.

A) <u>Lessor's Service Fee</u>. In consideration of the lease of the Leased Equipment, and for its share of the projected costs to

maintain the Transmission Site and the Leased Equipment, Lessor shall pay Lessee an annual service fee provided for in Exhibit D.

B) Lessee's Transmission Fee. Commencing on the date of completion of construction at the Transmission Site and continuing thereafter during the Initial and Renewal Terms of this Agreement, if any, Lessee shall pay to Lessor the Annual Transmission Fee provided in Exhibit D which is attached herewith and incorporated by reference herein.

C) Subscriber Royalty Fees. Commencing on the date of completion of construction at the Transmission Site and continuing thereafter during the Initial and Renewal Terms of this Agreement, if any, Lessee shall pay to Lessor the Subscriber Royalty Fee provided in Exhibit D which is attached herewith and incorporated by reference herein. All computations of subscriber royalty fees herein shall be based upon the average number of subscribers subscribing to Lessee's pay television programming service. As used herein, the term "Subscriber" means a person who is paying for Lessee's basic (first tier or entry level) programming service. For purposes of this paragraph, the average number of subscribers shall equal the number of subscribers as of the last day of the prior month plus the number of subscribers as of the last day of the current month divided by two. For purposes of this paragraph in situations where programming is sold in bulk (that is, where a number of viewing units are grouped for billing purposes--such as may be the case with hotels and some multiple dwelling units), the number of equivalent subscribers shall be determined by dividing the total monthly revenues derived from such bulk billing point by Lessee's then

prevailing retail monthly rate for the equivalent programming service to individual subscribers in the Metropolitan Area. If the date of completion of construction at the Transmission Site shall be a date other than the first day of a calendar month or this Agreement shall be terminated on a date other than the last day of a calendar month, then the Subscriber Royalty Fee for that partial month shall be paid on a proportionate basis.

D) Notice of Construction and Operation; Required Certificate. Within ten (10) days of completion of construction at the Transmission Site, Lessee shall notify Lessor in writing of the date of such completion of construction. Within five (5) days of placing the ITFS Channels into operation, Lessee shall notify Lessor in writing of the date of commencing such operation. Within thirty (30) days of the end of each month in which Excess Capacity Airtime is leased hereunder, Lessee shall provide Lessor with a certificate, certified as accurate and correct by an authorized agent of Lessee, showing the average number of subscribers served during such month.

E) Right to Audit. Lessee shall for a period of three (3) years after their creation, keep, maintain and preserve complete and accurate records and accounts, including all invoices, correspondence, ledgers, financial and other records pertaining to Lessee's use of Excess Capacity Airtime and Lessor's charges hereunder; and such records and corporate accounts shall be available for inspection and audit at Lessee's corporate offices or at Lessee's offices in the Metropolitan Area, as designated by Lessee, at any time or times during the term of this Agreement or within ninety (90) days thereafter, during reasonable business

hours, by Lessor or its nominee. Notwithstanding the foregoing, Lessor shall be entitled to only one audit of Lessee's records and accounts during any calendar year and such audit shall be limited to the records and accounts of Lessee for the immediately preceding twelve (12) months, unless an error exceeding ten percent (10%) of the total is found, in which case Lessee's records and accounts of the immediately preceding three (3) years may be inspected. Lessor shall provide Lessee with fifteen (15) business days advance notice of its intent to inspect such records and accounts prior to being allowed to do so. All information obtained by Lessor during any audit herein shall be maintained by Lessor in strict confidence.

7. PROGRAMMING.

A) Control Over Programming.

1) Program Content.

Lessee intends that only programming of a sort which would not serve to place Lessor's reputation in the community in jeopardy will be transmitted by Lessee on the ITFS Channels. In an attempt to minimize disputes, recognizing the difficulties inherent in specifying exact standards herein, it is agreed that Lessee shall have the right to market the programming provided by the networks and services listed on Exhibit E or its equivalent. If, however, the programming content of any of the networks and services listed on Exhibit E materially changes, Lessor shall have the right, upon ninety (90) days notice, to deny Lessee the right to continue transmitting such programming if Lessor would have the right to deny Lessee the right to transmit such programming under the provisions of this paragraph in the first

instance. If Lessee proposes to transmit the programming of any new programming service, the Lessee shall notify Lessor in writing specifying in detail the nature of the new programming service and Lessor shall have the right, upon written notice served upon Lessee within thirty (30) days after Lessor's receipt of any such notice from Lessee, to deny to Lessee the right to transmit such service if such programming is obscene and/or contradicting local, state and/or federal laws or otherwise violates any federal, state or local laws or regulations. If no such denial notice is received by Lessee within such thirty (30) days, Lessee shall be authorized to transmit all such services for which no denial notice is received. There shall be no reduction in fees required under this Agreement for any such programming not permitted to be transmitted.

2) Right to Delete. In addition to the rights and obligations set forth in paragraph 7(A)(1) above, Lessor may interrupt any of Lessee's programs in progress or prohibit Lessee from future exhibitions of any programs aired on Lessor's ITFS Channels which contravene the standards set forth in paragraph 7(A)(1).

B) Availability of Programming. Commencing on the date of completion of construction at the Transmission Site and annually thereafter throughout the Initial Term, Lessee agrees to pay five thousand dollars ($5,000.00) per year, adjusted annually for inflation, for the acquisition of qualified ITFS educational programming for Lessor's use during Lessor's Primary Airtime on the ITFS channels. These yearly programming costs payable to Lessor shall be increased annually by the same percentage as the

increase in the Consumer Price Index for all Urban Consumers (CPI-U) published by the Bureau of Labor Statistics of the United States Department of Labor or should this index be discontinued such successor index that most nearly approximates the CPI-U. The base CPI-U figure shall be the most recent monthly CPI-U figure available in the month in which the completion of construction at the Transmission Site occurs. At least one hundred eighty (180) days prior to the expiration of the Initial Term, the parties shall begin negotiations to establish the programming costs for the Renewal Term. Unless otherwise resolved, Lessee shall at ninety (90) days prior to the expiration of the Initial Term provide Lessor with a written offer of annual programming costs for the Renewal Term. Within thirty (30) days of receipt of Lessee's written offer, Lessor shall, at its option, have the following rights: (1) Lessor may terminate this Agreement; or (2) Lessor may refer the question of programming costs to an impartial arbitrator for determination. With regard to the right to refer the question or programming costs to an arbitrator, such arbitrator shall be chosen either by agreement of Lessee and Lessor or, at the option of either party, be referring the question to the American Arbitration Association with instructions that the American Arbitration Association select a single arbitrator under a request from the Parties for expedited and accelerated determination. The determination of the arbitrator chosen under either option contained in this paragraph shall be based upon consideration of programming of a similar type and relative expense as used in the first year of this Agreement and shall be final and binding upon Lessor and

Lessee. The Parties shall share equally in the costs and fees of the Arbitration.

C) Carriage of EWTN. If so designated by Lessor, Lessee agrees to transmit on one of the ITFS Channels the programming of Eternal World Television Network ("EWTN") during those time periods such channel is not used for Lessor's ITFS programming ("EWTN Airtime") so long as Lessee is not required to pay a fee for carriage of EWTN. The carriage of EWTN pursuant to this paragraph shall not be considered a Significant Reduction in Lessee's Airtime for the channel on which EWTN is carried as that term is defined in paragraph 2(G) and shall not trigger any of Lessee's rights as contained in paragraph 2(H). In the event Lessee is permitted to program the hours previously occupied by EWTN, then Lessee shall increase, in proportion to the increase in Excess Capacity Airtime, the amount of transmission fees and subscriber royalty fees payable under the provisions of paragraphs 6(B) and 6(C) of this Agreement during the remainder of the term(s) of the Agreement. For purposes of calculating any such proportionate increase, the parties acknowledge and agree that the transmission fee and subscriber royalty fee agreed to herein are based on Lessee's equivalent use of three full-time ITFS Channels.

D) Integration of Lessor's Programming. Lessee agrees to integrate Lessor's programming into the overall communications service offered to subscribers, without cost to Lessor. This integration shall include, but not be limited to, listing Lessor's material in any program guides produced by Lessee for subscribers.

E) Station Identification. To the extent required by FCC rules, Lessee shall transmit the call sign of Lessor's ITFS station over each ITFS Channel.

8. PROSECUTION OF PETITIONS, AUTHORIZATIONS AND LICENSES.

A) Best Efforts to Secure Approval of this Agreement. The parties recognize that certain approvals will be required from the FCC in order to effectuate this Agreement. Both parties shall use their best efforts to prepare, file and prosecute before the FCC all petitions, waivers, applications and other documents necessary to secure any FCC approval required to effectuate this Agreement. Lessee shall assist in the preparation and prosecution of such applications and as provided for herein, shall pay all filing fees, attorney's fees, engineering fees, and all other expenses in connection therewith provided Lessee has approved of such fees and expenses in advance. If requested to by Lessee, Lessor agrees to make application for an omnidirectional antenna and to request frequency protection within a protected service area as permitted by FCC rules. Lessor also agrees to cooperate with Lessee's efforts to cause other ITFS, OFS, MDS and MMDS operators to co-locate at the Transmission Site. Notwithstanding anything in this Agreement to the contrary, it is understood that no filing shall be made with the FCC with respect to this Agreement unless both parties have reviewed such filing and consented in writing to its submission, such consent not to be unreasonably withheld.

B) Further Efforts. Throughout the Initial Term and the Renewal Term of this Agreement, Lessor shall use its best efforts to obtain receive sites and to obtain and maintain in force all

licenses, permits and authorizations required for Lessee and Lessor to use the ITFS Channels as contemplated by this Agreement. Lessee shall be responsible for all reasonable expenses incurred to obtain and maintain in force such licenses, permits and authorizations provided Lessee has approved of such fees and expenses in advance. When mutually agreed by the parties and at Lessee's sole expense, Lessor shall apply for, and use its best efforts to obtain those reasonable license modifications which would assist Lessee in its business. Lessor also shall consider filing, at Lessee's sole expense, such reasonable protests, comments or other petitions to deny any other ITFS, MMDS, MDS and/or OFS applications or amendments as may be requested by Lessee in the mutual best interests of the parties and the public. Lessor and Lessee shall promptly notify each other of any event of which it has knowledge that may affect any of the licenses, permits or authorizations affecting the ITFS Channels.

C) Attorneys Fees. With respect to any legal work conducted pursuant to paragraphs 8(A) and (B) above on behalf of Lessor, the parties agree to employ the law firm of Pepper & Corazzini, 1776 K Street, N.W., Suite 200, Washington, D.C. 20006. Lessee shall be responsible for all reasonable attorneys fees in connection therewith and shall make payments directly to Pepper & Corazzini.

9. REPRESENTATI~NS AND WARRANTIES.

A) Represent~tions and Warranties of Lessor. Lessor represents and warrants to Lessee as follows:

1) Organization. Lessor is a non-profit organization duly organized and existing in good standing under the laws of the State of Rhode Island, and it has full power and authority to carry out all of the transactions contemplated by this Agreement and all other agreements, certificates or instruments executed and delivered in connection herewith.

2) No Violation. Neither the execution nor delivery of this Agreement or any other agreements, certificates or instruments executed and delivered herewith, nor the performance of the transactions contemplated hereby constitute or will constitute a violation of, be in conflict with, or a default under any term or provision of the governing instruments of Lessor or any agreement or commitment to which Lessor is bound, or any judgment, decree, order, regulation or rule of any court or governmental authority, or any statute of law. Except for approval of the FCC, no consent of any federal, state or local authority is required in connection with the execution and delivery of this Agreement or any other agreements, certificates or instruments executed and delivered herewith or with the performance of the transactions contemplated hereby.

B) Representations and Warranties of Lessee. Lessee represents and warrants to Lessor as follows:

1) Organization. Lessee is duly organized, validly existing and in good standing under the laws of the State of its incorporation and it has full power and authority to own property and to carry out all of the transactions contemplated by this Agreement, and all other agreements, certificates or instruments executed and delivered by Lessee in connection herewith.

2) <u>Corporation Action; Valid and Binding Agreements.</u> Lessee has taken all corporate action necessary to authorize the execution and delivery of this Agreement and all other agreements, certificates or instruments executed and delivered in connection herewith. Upon execution and delivery, this Agreement and all other agreements, certificates or instruments executed and delivered by Lessee in connection herewith will constitute valid and binding agreements of Lessee enforceable in accordance with their respective terms.

3) <u>Litigation and Investigations.</u> There is no action, suit, proceeding or investigation pending or, to the best of Lessee's knowledge, threatened against Lessee, its principals or related entities before any court, administrative agency or other governmental body, and Lessee does not know nor is aware of any reason for commencement of any such action, proceeding or investigation.

4) <u>Misrepresentation of Material Fact.</u> To the best of Lessee's knowledge, information and belief, no document or contract that was shown to Lessor and which in any way affects any of the properties, assets or proposed transactions of Lessee as such relates to this Agreement, no certificate or statement furnished by or on behalf of Lessee in connection with this Agreement, nor this Agreement itself contains any untrue statement of material fact or omits to state a material fact which would make the statements contained herein misleading.

C) <u>Survival or Representations and Warranties.</u> The representations and warranties contained in this Agreement shall be deemed to be continuing during the Initial and Renewal Terms

of this Agreement, and each Party shall have the duty promptly to notify the other of any event or circumstance which might reasonably be deemed to constitute a breach of or lead to a breach of its warranties or representations hereunder. The waiver by either Party of any breach of any representation or warranty under this Agreement shall not constitute a waiver of any other representation or warranty or of any failure in the future by the other Party to fulfill such representation or warranty.

10. TERMINATION.

A) Termination of FCC Authorization. Without further liability to either Lessor or Lessee, this Agreement shall terminate in the event that for any reason (i) Lessor shall not be licensed on the leased ITFS Channels, or (ii) the FCC shall terminate or diminish Lessor's authority to lease the ITFS Channels in accordance with the terms of this Agreement.

B) Termination by Reason of Default. At the option of the non-defaulting party, this Agreement may be terminated upon the material breach or default by the defaulting party of its duties and obligations hereunder if such breach or default is not cured by such defaulting party and if such breach or default shall continue for a period of thirty (30) consecutive days after such defaulting party's receipt of notice thereof from the non-defaulting party, or in the case of a breach or default which is not capable of being cured in such thirty (30) day period, if the party in breach or default does not, within such thirty (30) day period, commence and diligently pursue steps to cure such breach or default. It is understood and agreed that any failure on the

part of Lessee to make any payment required under Paragraph 6 hereof shall be a material breach or default of its duties and obligations hereunder. It is also understood and agreed that any consequences resulting from the loss of local participating receive sites for reasons that are not the fault of Lessor shall not be considered a material breach or default by Lessor of its duties and obligations hereunder.

C) Remedies to Continue. In the event of termination of this Agreement pursuant to Paragraph 10(B), such termination shall not affect or diminish the rights or claims or remedies available in equity or at law to the non-defaulting party arising by reason of a breach or default of this Agreement. However, no liability shall arise on the part of Lessor or Lessee upon termination of this Agreement pursuant to paragraph 10(A) except where the loss of the FCC license occurs as a result of the default of either party.

11. TRANSFER OF RIGHTS AND OBLIGATIONS.

Lessee shall have the right to assign its rights under this lease as collateral for any financing arrangements it makes. Lessee shall also have the right to pledge the Leased Equipment as collateral security for any loans it makes; provided however, that any pledge of the Leased Equipment shall be made subject to the provisions of this lease. Lessee shall further have the right to subcontract any portion of its obligations under this Agreement to any partnership, joint venture, corporation or entity which Lessee may choose, provided that Lessee gives Lessor notice of any proposed subcontracting and, provided further, that no such subcontracting shall release Lessee from fulfilling all

of its obligations under this Agreement. Lessee shall have the right to assign or transfer its rights, benefits, duties and obligations under this Agreement to a commonly-owned company without the prior consent of Lessor. Lessee shall have the right to assign or transfer its rights, benefits, duties or obligations under this Agreement to a third party without the prior consent of Lessor if the third party prepays to Lessor at the time of such assignment or transfer one year's Transmission Fee and an estimated one year's Subscriber Royalty Fee subject to any final adjustments; otherwise Lessee shall obtain the prior written consent of Lessor. Finally, Lessor may not assign or transfer its rights, benefits, duties or obligations under this Agreement without the prior written consent of the Lessee, which consent shall not be unreasonably withheld.

12. START DATE.

For the purposes of this Agreement, the Start Date shall be the date of the grant to Lessor of the FCC authority to operate the ITFS Channels in accordance with the terms of this Agreement.

13. INDEMNIFICATION.

A) By Lessor. To the extent permitted by state and federal law and its charter or by-laws, Lessor shall forever protect, save and keep Lessee and its permitted successors and assigns harmless and indemnify Lessee against and from any and all claims, demands, losses, costs, damages, suits, judgments, penalties, expenses and liabilities of any kind or nature whatsoever, including reasonable attorney's fees, arising directly or indirectly out of (i) the willful misconduct of Lessor, its agents or employees in connections with the perform-

ance of this Agreement, or (ii) any programming transmitted by Lessor during any of Lessor's Airtime.

B) By Lessee. To the same extent Lessee is permitted by law to indemnify Lessor, Lessee shall forever protect, save and keep Lessor and its permitted successors and assigns harmless and indemnify Lessor against and from any and all claims, demands, losses, costs, damages, suits, judgments, penalties, expenses and liabilities of any kind or nature whatsoever, including reasonable attorney's fees, which arise directly and indirectly out of (i) the negligence or willful misconduct of Lessee, its agents or employees, in connection with the performance of this Agreement; (ii) any programming transmitted by Lessee pursuant to this Agreement; (iii) any and all dealings by Lessee or any of its authorized agents or subcontractors with the public, third parties and subscribers to the Lessee's programming service; or (iv) any maintenance, installation or other work performed by Lessee or any authorized agent or subcontractor under this Agreement.

C) Notice of Claim; Defense of Claim. Each party shall notify the other of any such claim promptly upon receipt of same. Either party (hereinafter referred to as appropriate the "Indemnitor" or the "Indemnitee") shall have the option to defend, at its own expense, any claims arising under this Paragraph. If Indemnitor assumes the defense of any such claim, Indemnitee shall delegate complete and sole authority to the Indemnitor to defend or settle same and Indemnitee shall cooperate with Indemnitor in the defense thereof.

14. INSURANCE.

A) Policies Required. At its expense, Lessee shall secure and maintain with financially reputable insurers, one or more policies of insurance insuring the Leased Equipment and Lessee's utilization of the ITFS Channels against casualty and other losses of the kinds customarily insured against by firms of established reputations engaged in the same or similar line of business, of such types and in such amounts as are customarily carried under similar circumstances by such firms, including, without limitation: (i) "All risk" property insurance covering the ITFS Equipment and the Common Equipment to the extent of one hundred percent (100%) of its full replacement value without deduction for depreciation: (ii) comprehensive general public liability insurance covering liability resulting from Lessee's operation of the ITFS Equipment on an occurrence basis having minimum limits of liability in an amount of not less than one million dollars ($1,000,000.00) for bodily injury, personal injury or death to any person or persons in any one occurrence, and not less than two million dollars ($2,000,000.00) in the aggregate for all such losses during each policy year, and not less than one million dollars ($1,000,000.00) with respect to damage to property; (iii) all workers compensation, automobile liability and similar insurance required by law.

B) Insurance Policy Forms. All policies of insurance required by this Paragraph shall, where appropriate, designate Lessor as either the insured party or as a named additionally insured party, shall be written as primary policies, not contributory with and not in excess of any coverage which Lessor shall

carry, and shall contain a provision that the issuer shall give to Lessor thirty (30) days prior written notice of any cancellation or lapse of such insurance or of any change in the coverage thereof.

C) Proof of Insurance. Executed copies of the policies of insurance required under this section or certificates thereof shall be delivered to Lessor not later than ten (10) days prior to the start of construction at the Transmission Site. Lessee shall furnish Lessor evidence of renewal of each such policy not later than thirty (30) days prior to the expiration of the term thereof.

15. RELATIONSHIP OF PARTIES.

By the provisions of this Agreement, Lessor and Lessee intend to enter an airtime lease relationship and not a joint venture. They will carry out this Agreement to preserve that intent. Neither party shall represent itself as the other party, nor as having any relationship with one another, except as Lessor and Lessee under the terms of this Agreement.

16. OPTIONS TO PURCHASE EQUIPMENT.

A) Lessor's Option to Purchase. In the event that this Agreement is terminated, Lessor shall have the option to purchase the Leased Equipment used exclusively for Lessor's ITFS license. Any equipment which is used in a shared fashion (such as transmit antenna, decoders, and combiners) in providing signals other than Lessor's signals are excluded from this option to purchase. The intent of the purchase option provided for in Paragraphs 16(A) is to provide Lessor with the capability to continue to perform on

Lessor's ITFS license. The purchase price shall be the then book value (depreciated cost of assets) of such equipment noted above.

B) <u>Lessee's Option to Purchase</u>. If during the terms of this Agreement the FCC modifies its rules so as to enable Lessee to be licensed to operate the ITFS frequencies, Lessee shall have a right of first refusal to acquire such licenses subject to the same terms and conditions as the right provided for in paragraph 1(C).

17. <u>NON-DISCLOSURE</u>.

Lessor acknowledges that there may be made available to it pursuant to this Agreement proprietary information of Lessee relating to the encoding and/or decoding system associated with the ITFS channel equipment and its patented processes including, but not limited to, improvements, innovations, adaption, inventions, results of experimentation, processes and methods, whether or not deemed patentable, and certain business and marketing techniques (all herein referred to as "Confidential Information"). Lessor acknowledges that this Confidential Information has been developed by Lessee at considerable effort and expense and represents special, unique and valuable proprietary assets of Lessee, the value of which may be destroyed by unauthorized dissemination. Accordingly, Lessor covenants and agrees that, except as may be required for the performance of this Agreement, neither it nor any of its agents or affiliates shall disclose such Confidential Information to any third person, firm, corporation or other entity for any reason whatsoever, such undertaking to be enforceable by injunctive or other equitable relief to prevent any violation or threatened violation thereof.

18. NON-COMPETITION. During the term of this Agreement, Lessor agrees not to transmit programming or to lease or sub-lease any channel capacity on its ITFS Facilities for the transmission of programming that is competitive with the programming transmitted by Lessee. Lessor shall not, at any time during the term of this Agreement, become the licensee of any other ITFS facility within the Metropolitan Area.

19. FORCE MAJEURE.

If by reason of Force Majeure either party is unable in whole or in part to perform its obligations hereunder, the party shall not be deemed in violation of default during the period of such inability. As used herein, the phrase "Force Majeure", shall mean the following: act of God, acts of public enemies, orders of any branch of the government of the United States of America, any state or any political subdivisions, thereof which are not the result of a breach of this Agreement, orders of any military authority, insurrections, riots, epidemics, fires, civil disturbances, explosions, or any other cause or event not reasonably within the control of the adversely affected party.

20. CONDITION PRECEDENT.

This Agreement is conditional on the issuance of a Final Order by the FCC granting Lessor a construction permit for the ITFS Channels in the Metropolitan Area from the Transmission Site. By "Final Order" the parties mean an action or order of the FCC which is not reversed, stayed, enjoined, vacated, set aside, annulled or suspended and with respect to which no timely-filed request for administrative or judicial review is pending

and as to which the time for filing any such request, or for the FCC to set aside the action on its own motion, has expired.

21. NOTICE.

Any notice required to be given to Lessor under any provision of this Agreement shall be delivered personally or by certified mail to Lessor at the address first written above. Any noticed required to be given to Lessee under any provision of this Agreement shall be delivered personally or by certified mail to Lessee at the address first written above and to William D. Freedman, Esq., Gurman, Kurtis, Blask & Freedman, 1400 16th Street, N.W., Suite 500, Washington, D.C. 20036.

22. SEVERABILITY.

Should any court or agency determine that any provision of this Agreement is invalid, the remainder of the Agreement shall remain in effect.

23. WAIVER.

A waiver by either Lessor or Lessee of a breach of any provision of this Agreement shall not be deemed to constitute a waiver of any preceding or subsequent breach of the same provision or of any other provision.

24. PAYMENT OF EXPENSES. Except as otherwise provided, Lessee shall pay all costs and expenses incident to fulfilling this Agreement, including but not limited to, marketing and receive site acquisition costs and attorneys fees; provided however, that all such costs and expenses shall be approved by Lessee in advance. Pursuant to this Agreement, Lessee agrees to pay Lessor the receive site acquisition costs of four thousand dollars ($4,000.00). Payment of such acquisition costs shall be

one thousand dollars ($1,000.00) upon Lessor's commencement of work to acquire such receive sites subject to the parties' agreement to begin such work and three thousand dollars ($3,000.00) upon receipt by Lessee of four qualified receive site letters.

25. VENUE AND GOVERNING LAW.

Venue for any cause of action brought by or between Lessor or Lessee relating to this Agreement, shall be in Providence County, Rhode Island and all provisions of this Agreement shall be construed under the laws of the State of Rhode Island.

26. COUNTERPARTS.

This Agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which shall constitute one and the same instrument, and shall become effective when each of the parties hereto shall have delivered to it this Agreement duly executed by each of the other parties hereto.

27. ENTIRE AGREEMENT.

This Agreement constitutes the entire Agreement between the parties and supersedes all prior oral or written provisions of any kind. The parties further agree that this Agreement may only be modified by written agreement signed by both parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement at Colorado Springs, CO this 3rd day of December, 1991.

LESSOR: North American Catholic Educational Programming Foundation, Inc.

BY: John Primeau
John Primeau
President

executed at Providence
12-4-91

LESSEE: American Telecasting, Inc.

BY: [signature]
Brian E. Gast
CEO & President

EXHIBIT A

Schedule of Airtime

The schedule of daily hours depicting Lessor's Primary Airtime, Lessor's Ready Recapture Airtime and Lessee's Excess Capacity Airtime shall be attached hereto as Exhibit A within thirty (30) days of the grant of a conditional license to Lessor.

EXHIBIT B

Receive Sites

Upon the filing of the ITFS application, there shall be attached hereto and incorporated herein by reference a copy of FCC Form 330 Section IV listing Lessor's receive sites.

# EXHIBIT C

## Leased Equipment

Noted below is a list of equipment that Lessee is leasing to Lessor.

(1) Four ITFS transmitters and related hardware.

(2) Lessor's ITFS receive site antenna and related hardware.

* (3) Combining network transmission line and antenna

* Common Equipment

EXHIBIT D

Service, Transmission and Royalty Fees

1. Lessor's Service Fee

| Services Provided | Annual Fee |
|---|---|
| (a) Lease of Leased Equipment (¶5(a)) | $ 1.00 |
| (b) Maintenance of Leased Equipment (¶3(c)) | $ 1.00 |

2. Lessee's Transmission Fee

Lessee shall pay Lessor a monthly transmission fee of one thousand dollars ($1,000.00). Payment shall be due by the fifth day of each calendar month for the preceding month. If Fees under Paragraph 6 initially begin to accrue on a day other than the first day of the month or this Agreement is terminated on a day other than the last day of the month, the payment for that month shall be prorated.

3. Subscriber Royalty Fee

Lessee shall pay Lessor a Subscriber Royalty Fee of ten cents ($0.10) per month for each monthly subscriber served by Lessee as defined in Paragraph 6(c) over ten thousand (10,000) subscribers. Payment shall be due by the fifth day of each calendar month for the preceding month. If Fees under Paragraph 6 initially begin to accrue on a day other than the first day of the month or this Agreement is terminated on a day other than the last day of the month, the payment shall be prorated.

# EXHIBIT E

## Programming

The following is a list of program services, networks and special events Lessee expects to provide over Lessee's System.

The Discovery Channel

The Learning Channel

C-Span

EWTN

1)

# FIRST AMENDMENT TO ITFS EXCESS CAPACITY AIRTIME LEASE AGREEMENT

BRADENTON, FLORIDA (WLX-724)

---

The ITFS Excess Capacity Airtime Lease Agreement ("Agreement") for the above-referenced market, by and between North American Catholic Educational Programming Foundation, Inc. ("Lessor") and American Telecasting, Inc. ("Lessee") is hereby amended for the first time in the following respects:

1. Paragraph 3(B) is amended to read as follows:

B) System Construction. Lessee shall complete construction of the ITFS Channel Transmission Facilities at the Transmission Site no later than the end of the first extension period granted to Lessor by the FCC. At its expense Lessee shall purchase and install such transmitters, transmission line, modulators, antennas and other equipment as required . . . (the remainder of this paragraph remains unchanged).

2. Paragraph 6(B) is amended to read as follows:

B) Lessee's Transmission Fee. Commencing eighteen months from the date the FCC granted Lessor its ITFS license for the market (i.e., commencing on April 28, 1994), and continuing thereafter during the Initial and Renewal Terms of this Agreement, if any, Lessee shall pay to Lessor the Monthly Transmission Fee provided in Exhibit D. . . . (the remainder of this paragraph remains unchanged).

3. Paragraph 6(C) is amended to read as follows:

B) Subscriber Royalty Fees. Commencing eighteen months from the date the FCC granted Lessor its ITFS license for the market (i.e., commencing on April 28, 1994), and continuing thereafter during . . . . (the remainder of this paragraph remains unchanged).

4. Paragraph 7(B) is amended to read as follows:

B) Availability of Programming. Commencing eighteen months from the date the FCC granted Lessor its ITFS license for the market (i.e., commencing on April 28, 1994), and continuing annually thereafter through the Initial Term, Lessee agrees to pay Lessor five thousand dollars ($5,000) per year, adjusted annually for inflation, for . . . (the remainder of this paragraph remains unchanged).

5. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.

By ______________________ Date: April 12, 1994
John Primeau
President

AMERICAN TELECASTING, INC.

By ______________________ Date: April 21, 1994
Brian Gast
President

**SECOND AMENDMENT TO**
**ITFS EXCESS CAPACITY AIRTIME LEASE AGREEMENT**

This AMENDMENT TO ITFS EXCESS CAPACITY AIRTIME LEASE AGREEMENT (the "Amendment") is entered into by and between North American Catholic Educational Programming Foundation, Inc. ("Lessor") and American Telecasting, Inc. ("Lessee") as of May, 30, 1997.

WHEREAS, Lessor is licensed by the Federal Communications Commission to operate Instructional Television Fixed Service ("ITFS") station WLX-724 (the "Station") on Channels D1-D4 (the ("Leased Channels") in Bradenton, Florida;

WHEREAS, Lessor and Lessee are parties to that certain ITFS Excess Capacity Airtime Lease Agreement (the "Lease") with respect to the Station dated as of December 4, 1991, as amended;

WHEREAS, the Initial Term commenced as of October 28, 1992 and the Renewal Term, if any, will commence as of October 28, 1997;

WHEREAS, the Lease provides for the renegotiation of Lessee's programming fee to establish said fee for the Renewal Term (as defined in the Lease);

NOW, THEREFORE, in consideration of the mutual promises and conditions contained herein, the parties agree as follows:

1. Paragraph 7(B) of the Lease is amended to read as follows:

> B) <u>Availability of Programming</u>. For the acquisition and production of Lessor's qualified educational programming, Lessee shall pay to Lessor an annual programming fee ("Programming Fee") of five thousand dollars ($5,000.00) or the monthly subscriber fee of twenty (0.20) per subscriber (the "Programming Fee Basis"), whichever amount is greater. The Programming Fee Basis shall be adjusted annually by an amount equal to the percentage increase in the Consumer Price Index ("CPI") for all urban consumers in the Metropolitan Area. All computations of programming fees shall be based upon the average number of subscribers to Lessee's pay television service in the Metropolitan Area. As used herein, the term "subscriber" means a person who is paying for Lessee's basic (first-tier or entry-level) programming service. For purposes of this paragraph, the average number of subscribers shall equal the number of subscribers as of the last day of the prior month plus the number of subscribers as of the last day of the current month divided by two. For purposes of this paragraph, in situations where programming is sold in bulk (that is, where a number of viewing units are grouped for billing purposes, such as may be the case with hotels and multiple-dwelling units) the number of

equivalent subscribers shall be determined by dividing the total monthly revenue derived from such bulk billing by Lessee's then-prevailing retail monthly rate for the equivalent programming service to individual subscribers in the Metropolitan Area. If this Agreement is terminated on a date other than the last day of a calendar month, the programming fee for that month shall be prorated on a daily basis.

2. This Amendment is effective as of October 28, 1997 and payments to be made pursuant to paragraph (1) above shall commence as of that date.

3. Lessee and Lessor hereby extend the Lease through the Renewal Term.

4. Unless otherwise defined, the terms used herein shall have the same meaning given to them in the Lease.

5. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, together, constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first written above.

**NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.**

By: ______________________
John Primeau
President

**AMERICAN TELECASTING, INC.**

By: ______________________
Robert D. Hostetler
President & CEO

HJB/de
f:\wp\2057PP\2ndamend.lse

**THIRD AMENDMENT TO**
**ITFS EXCESS CAPACITY AIRTIME LEASE AGREEMENT**

This AMENDMENT TO ITFS EXCESS CAPACITY AIRTIME LEASE AGREEMENT (the "Amendment") is entered into by and between North American Catholic Educational Programming Foundation, Inc. ("Lessor") and American Telecasting, Inc. ("Lessee") as of May 30, 1997.

WHEREAS, Lessor is licensed by the Federal Communications Commission to operate Instructional Television Fixed Service ("ITFS") station WLX-724 (the "Station") on Channels D1-D4 (the ("Leased Channels") in Bradenton, Florida;

WHEREAS, Lessor and Lessee are parties to that certain ITFS Excess Capacity Airtime Lease Agreement (the "Lease") with respect to the Station dated as of December 4, 1991, as amended;

WHEREAS, the Initial Term commenced as of October 28, 1992 and the Renewal Term, if any, will commence as of October 28, 1997;

NOW, THEREFORE, in consideration of the mutual promises and conditions contained herein, the parties agree as follows:

1. Paragraph 1(B) of the Agreement is amended to read as follows:

B) Renewal Term.

(a) Provided Lessee's rights have not been terminated pursuant to Paragraph 9(a), this Agreement shall automatically and without further notice be extended for one (1) additional term (such additional term is hereinafter referred to as the "Renewal Term") of five (5) years unless and until Lessee shall have served written notice on Lessor at least sixty (60) days prior to the expiration date of the Initial Term that Lessee elects not to renew this Agreement for the Renewal Term. It is acknowledged and agreed that Lessee shall have the absolute right not to renew this Agreement notwithstanding any provision hereof to the contrary.

(b) Unless terminated pursuant to any applicable provision of the Agreement, this Agreement shall automatically and without further notice be extended for an additional renewal term (the "Additional Renewal Term") of five (5) years, unless the number of Subscribers to Lessee's System, as of the day that is ninety (90) (the "Subscriber Date") days prior to the expiration date of the Renewal Term, does not equal or exceed 7,704 (the average percentage of Lessee's penetration in its markets as of January 31, 1997 (2.012%), multiplied by the number of line of site households in Bradenton (the

"Subscriber Multiple")), in which event, the Agreement shall expire at the end of the Renewal Term unless Lessor, at its sole option and discretion, elects to renew the Agreement for the Additional Renewal Term (the "Renewal Option"). Lessee shall provide Lessor with the number of Subscribers to Lessee's System (the "Subscriber Information") as of the Subscriber Date no later than ten (10) days subsequent to the Subscriber Date. In the event the number of Subscribers to Lessee's System on the Subscriber Date does not equal or exceed the Subscriber Multiple and unless Lessor exercises its Renewal Option within ten (10) days from receipt of the Subscriber Information, Lessor shall be deemed to have not exercised the Renewal Option and the Agreement shall expire at the end of the Renewal Term.

2. Paragraph 2(J) of the Agreement is amended to read as follows:

J) **Expanded System Capacity**.

Lessee shall have the right at any time to require Lessor to file with the FCC any necessary application to expand the Station's channel capacity to enable it to carry more than one video signal per channel ("Channel Capacity Expansion"); provided however, before Lessee can exercise this right, it must demonstrate to Lessor's reasonable satisfaction that such modification will not materially degrade the performance of the Station nor impair signal quality at the ITFS receive points and further provided that all ITFS Channels shall be expanded contemporaneously in time with each other and at the same time as Lessee commences a Channel Capacity Expansion of a fifth (5th) channel (ITFS, MDS or MMDS) in Lessee's System. A Channel Capacity Expansion of the ITFS Channels shall be at a ratio equal to the highest level at which any other channel (ITFS, MDS or MMDS) in Lessee's System is expanded pursuant to a Channel Capacity Expansion. Once such modification has been constructed, the modified facilities shall automatically be considered a part of this agreement and subject to all terms and conditions hereof; provided however, that upon a Channel Capacity Expansion, the total of the Programming and Subscriber Royalty Fees ("Total Fees") payable to Lessor from Lessee shall be increased by an amount equal to twenty five (25) percent of the Total Fees. It is understood that, notwithstanding anything to the contrary herein and to the extent permitted by FCC rules, Lessee shall have the full time use of the Expanded Channels created from the Channel Capacity Expansion of three (3) of the

ITFS Channels and that Lessor shall have the full time use of the Expanded Channels created from the Channel Capacity Expansion of the fourth (4th) ITFS Channel.

3. The second sentence of Paragraph 4 of the Agreement deleted and replaced with the following:

Lessor may designate up to twenty (20) operating receive sites.

4. This Amendment is effective as of the date first written above.

5. Except as otherwise specified herein, terms defined in the Agreement are used herein with their defined meanings.

6. Notwithstanding anything to the contrary herein or in the Agreement, Lessor and Lessee agree that this Amendment shall not give rise to any rights or remedies beyond the expiration of any FCC license necessary for the continued operation of the ITFS Channels, whether such expiration occurs during the Initial Term the Renewal Term, the Additional Renewal Term or any extension of the Agreement.

7. Notwithstanding anything to the contrary herein, paragraph 1(C) of the Agreement shall remain in full force and effect as to the Renewal Term, unless the term of the Agreement is extended pursuant to the Additional Renewal Term, however, in the event the term of the Agreement is extended for the Additional Renewal Term, then the provisions of paragraph 1(C) shall apply to the Additional Renewal Term and all references to the Renewal Term therein shall be deemed to refer to the Additional Renewal Term.

8. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, together, constitute one and the same instrument.

**THE NEXT PAGE IS THE SIGNATURE PAGE**

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first written above.

**NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.**

By: ______________________
John Primeau
President

**AMERICAN TELECASTING, INC.**

By: ______________________
Robert D. Hostetler
President & CEO

HJB/de
f:\wp\2057PP\Renew.amd