UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| AMERICAN TELECASTING OF SANTA ROSA, INC., et al., Plaintiffs, | : | |
| v. | : | No. 07-467 ML |
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC., Defendant. | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

## I. INTRODUCTION

The present action concerns a dispute between the Plaintiffs, both of which are wholly owned subsidiaries of Sprint Nextel Corporation ("Sprint") (Verified Compl. ¶15 and Corporate Disclosure Statements)[1/] and North American Catholic Educational Programming Foundation, Inc. ("NACEPF") regarding Sprint's purported exercise of certain rights of first refusal ("ROFR") contained in two separate leases between the parties for the lease of spectrum in Santa Rosa, California and Bradenton, Florida. Sprint is before this Court seeking a temporary restraining order to prevent NACEPF from leasing this spectrum to another party, Clearwire Corporation ("Clearwire"), claiming that it has properly exercised its ROFR and is entitled to lease the spectrum in Santa Rosa and Bradenton.

Sprint's motion for a temporary restraining order, or any injunctive relief, should be denied. First, Sprint is unlikely to succeed on the merits of any of the claims it asserts in its

[1/] All recent communications by NACEPF and its counsel regarding the Santa Rosa, California and Bradenton, Florida leases were with Sprint. As a practical matter, because all the documents refer to Sprint and not the named Plaintiffs, NACEPF refers herein to Sprint instead of either named Plaintiff.

Verified Complaint because it failed to properly exercise its ROFR rights. After being informed of each term of Clearwire's offer to lease the Santa Rosa and Bradenton spectrum, Sprint was entitled, under the terms of the ROFR, to accept the terms of the Clearwire offer, or accept the cash terms and substitute a cash equivalent for the non-cash terms in Clearwire's offer. Sprint did neither. Instead, Sprint ignored critical terms and consideration contained in Clearwire's offer, even after NACEPF repeatedly offered it the opportunity to address those terms (including after the time for Sprint's exercise had expired). Sprint's defective exercise of its ROFR rights fatally undermines its likelihood of success on the merits. For this reason alone, Sprint's request for a temporary restraining order should be denied.

Sprint also fails to show that it will suffer any harm, much less irreparable harm, should this Court fail to issue the requested injunctive relief. Sprint's allegations of harm are based on its bald assertions that NACEPF's spectrum is "a unique and irreplaceable asset" that is necessary for Sprint to provide commercial operations in these markets. But Sprint fails to establish that its loss of the ability to lease *this spectrum* will cause it *any* harm, much less *irreparable* harm. Indeed, Sprint has significant capacity in these markets already, even absent a lease on the spectrum at issue here. Sprint has not demonstrated that it has an immediate need to use this spectrum. Sprint's mere claim that the asset at issue is unique or in limited supply is not enough, without more, for Sprint to meet its burden to establish that it will suffer irreparable harm if it loses its right to lease that spectrum. The extraordinary remedy of a temporary restraining order should not issue on the basis of broad, unsupported allegations of harm.

While the Court need look no further than Sprint's failure to establish likelihood of success and irreparable harm, the remaining factors -- the balance of the harms and the public interest -- all favor this Court's denial of Sprint's motion.

## II. FACTS

### A. NACEPF's FCC Licenses And The Contractual Relationship Between NACEPF And Sprint.

NACEPF is a Federal Communications Commission ("FCC") licensee of 52 authorizations in the Educational Broadband Service ("EBS")[2/] that permit it to operate spectrum in the frequency band between 2500-2690 megaherzt ("MHz") (the so-called 2.5 gigahertz ("GHz") band) in various markets throughout the country, including Santa Rosa and Bradenton.[3/] Ex. 1, Primeau Aff. at ¶ 2. NACEPF uses this spectrum to facilitate the distribution of religious (www.nacepf.net) and educational programming (College & School Network (www.CSN-ed.net)) to the public, schools (public, private and parochial), and other public organizations. Id. at ¶1.

As permitted by the FCC's rules, NACEPF leased excess capacity in Santa Rosa and Bradenton to Plaintiffs' predecessors in interest for use in providing commercial wireless video distribution. See, Verified Compl. at Exs. A-B (Lease Agreements, Assignments and Amendments). Virtually all of NACEPF's leases, including the leases at issue here, contain a ROFR provision. Ex. 1, Primeau Aff. at ¶4. Under the ROFR terms, for one year past the end of the lease term, if NACEPF receives an offer from a third party proposing to buy or lease NACEPF's spectrum, NACEPF must notify the lessee of the third party offer and the lessee has the opportunity to enter into a sale or lease of the spectrum "for the same fees, charges, rental or other consideration for which Lessor proposed to lease or transfer to the third person." Verified Compl., Exs. A-B at ¶1(C). The ROFR provisions further state that if the fees, charges or other consideration to be paid by the third party are in a form other than cash, the consideration to be

---

[2/] EBS was formerly designated by the FCC as Instructional Television Fixed Service ("ITFS").

[3/] NACEPF has attached hereto all of the documents it cites, including the Affidavit of John Primeau, President of NACEPF, dated January 8, 2008. Documents are cited as Ex ___.

paid by lessee shall be in a cash amount fairly equivalent to the non-cash consideration. Id. If the lessor believes that the cash consideration offered by the lessee is not equal to the non-cash consideration offered by a third party, the lessee may refer that issue to arbitration. Id.

### B. Sprint Has Previously Been Provided With The Complete Clearwire Offer Documents And Has Declined To Match Clearwire's Offer.

By virtue of its purchase of a number of wireless video distributors that had lease agreements with NACEPF, Sprint is now the lessee of NACEPF's excess capacity in many of the markets in which NACEPF holds EBS licenses. Most, if not all, of these leases contain ROFR provisions similar to the ones at issue in the Santa Rosa and Bradenton leases. Ex. 1, Primeau Aff. at ¶4. On several prior occasions, NACEPF notified Sprint of competing lease offers from Clearwire, pursuant to ROFR rights in other leases between NACEPF and Sprint (or a Sprint subsidiary). See, e.g., Ex. 2 (May 11, 2007 letter re: Lansing, Michigan spectrum). On these prior occasions, NACEPF notified Sprint of the terms of Clearwire's offers to lease spectrum from NACEPF and provided complete copies of the agreements proposed by Clearwire, which terms were nearly identical in form to Clearwire's offers for the Santa Rosa and Bradenton markets. See, e.g., Ex. 3 (July 31, 2007 letter). Sprint has known of the detailed terms of Clearwire's competing offers to lease spectrum from NACEPF for at least five months. Id.

On July 31, 2006 NACEPF entered into two Master Use and Royalty Agreements with Clearwire, one of which also included other parties ("MRUA") and one of which was only between Clearwire and NACEPF ("MRUA-1," and with the MRUA, the "Clearwire Agreements") which generally define the relationship between Clearwire and NACEPF (and in the case of the MURA, between Clearwire and the other parties). Exs. 4-5 (MRUA and MRUA-

1, respectively).[4/] MRUA-1 provides, *inter alia*, for a mechanism pursuant to which the parties would, when NACEPF's then current spectrum leases expire, enter into an Individual Use Agreement ("IUA") covering the market relevant to the expired lease, subject to any ROFR or other outstanding rights. Ex. 5 at §1.02.

Since the effective date of the Clearwire Agreements, there have been eight instances in which NACEPF leases of spectrum to Sprint in other markets expired, triggering Sprint's rights to a one year ROFR period. While Sprint has declined to exercise its ROFR rights for any of these licenses, Sprint was provided with complete copies of the MRUA and MRUA-1 (as well as the IUA specific to the market at issue) no later than July 31, 2007. Ex. 3. Specifically with respect to the Santa Rosa and Bradenton markets, by letters dated November 6 and 7, 2007, NACEPF notified Sprint of Clearwire's offers, provided the IUAs specific to those markets and reminded Sprint that it had previously received the MRUA and MRUA-1, noting that both of those agreements contained important terms of Clearwire's offer relevant to the markets at issue. Exs. 6-7 (Letters and IUA's re: Santa Rosa and Bradenton, respectively).

### C. Sprint Did Not Timely Or Properly Exercise Its ROFR Rights For The Santa Rosa Or Bradenton Markets.

In response to NACEPF's letters of November 6 and 7, 2007, Sprint stated that it was electing to exercise its ROFR rights for the Santa Rosa and Bradenton markets. Ex. 8. However, instead of providing NACEPF with a draft agreement so that NACEPF could determine if Sprint

[4/] The MRUA relates principally to the parties' relationship with respect to spectrum that NACEPF was able to lease to Clearwire at the time the MRUA was executed. The MRUA-1 relates to the parties' relationship with respect to spectrum that NACEPF might be able to lease to Clearwire after that document was executed. Each of the Clearwire Agreements contain confidentiality provisions. Ex. 4-5, both at §11.14. In the context of Sprint's potential exercise of its ROFR rights for markets other than the markets at issue here, and prior to Sprint's purported attempt to properly exercise its ROFR rights here, Clearwire gave NACEPF permission to provide the Clearwire Agreements documents to Sprint for the purpose of Sprint's potential exercise of its ROFR rights. However, those documents are not a matter of public record or otherwise available and contain confidential business information of Clearwire. Accordingly, NACEPF has separately requested that those documents be protected from public disclosure in this case.

had agreed to meet the terms and conditions of the Clearwire offer, Sprint offered, in its December 6, 2007 letters, a cash substitute *only* for the so-called Equity Royalty and Access Rights Royalties contained in the Clearwire proposed leases. Id. Sprint also stated that: "the IUA [would be] be revised to take into account those provisions specific to the identity of Clearwire or that cannot be interpreted without reference to the MRUA or MRUA-1 (as defined in the ROFR Notice)." Id. By its December 6, 2007 letters, Sprint made it clear that it did not intend to enter into a lease "for the same fees, charges, rental or other consideration" offered by Clearwire.

Sprint's attempted exercise of its ROFR rights was ineffective for several reasons. First, the Clearwire offer is governed by an IUA, MRUA and MRUA-1, each of which contains a number of specific and material non-cash components. Instead of offering the same consideration as Clearwire, Sprint did not match certain of the non-cash consideration offered by Clearwire. Indeed, Sprint's attempted exercise of its ROFR, by way of its page and a half, cursory, letter offers NACEPF no assurance that Sprint intends to meet the non-cash provisions of the Clearwire Agreements.

Sprint's attempted exercise of its ROFR rights was also deficient because it made a cash offer for *only* two elements of the non-cash consideration specified in the Clearwire Agreements -- the Equity Royalty and Access Right Royalty. See Ex. 8 and Verified Compl., ¶25. Sprint ignored other non-cash consideration offered by Clearwire, including: Clearwire's obligation to purchase additional spectrum from NACEPF under certain conditions (a so-called Strategic Opportunity Spectrum Right capacity); Clearwire's obligation to reset to fair market value the Monthly Royalties upon the occurrence of a disassociation event; Clearwire's willingness to indemnify NACEPF for certain costs and expenses; and NACEPF's rights to information

regarding Clearwire not otherwise publicly available. See, Exs. 4 at §3.10, Exs. 4-5 both at Articles 8-9; Exs. 6-7 both at ¶¶10(f), 19-20.[5/]

While Sprint's exercise was improper and thus a waiver of its ROFR rights, NACEPF provided Sprint with an opportunity to properly exercise its ROFR rights, even though the time in which Sprint could exercise its rights had elapsed. NACEPF wrote to Sprint on December 13, 2007 pointing out that Sprint was required to meet each of the terms and conditions of the IUAs, MRUA and MRUA-1 in order to properly exercise its rights under the ROFR. Ex. 9. In the spirit of cooperation, NACEPF then provided Sprint with another seven days to properly exercise its ROFR. Id.

Instead of using this opportunity to properly exercise its ROFR rights for the Santa Rosa and Bradenton markets, Sprint wrote NACEPF on December 18, 2007, continuing to assert that it is not required to meet all the terms of the IUA. Ex. 10. Despite the fact that NACEPF provided Sprint with an opportunity to properly exercise its ROFR, Sprint failed to do so. As the parties disagree on the *fundamental* issue of whether Sprint has properly exercised its ROFR rights at all, Sprint's attempt to arbitrate the valuation of the Equity Royalty and Access Royalty is premature. Arbitration is only appropriate in instances where Sprint has properly exercised its ROFR rights and the parties disagree only on the cash valuation of non-cash terms.

Despite Sprint's initiation of this suit on December 18, 2007,[6] NACEPF again provided Sprint with an opportunity to cure the deficiency in the exercise of its ROFR rights. On

---

[5/] This list, and examples later in this memorandum, only constitute a partial list of the non-cash terms and consideration in Clearwire's offer that Sprint failed to address in its attempted exercise of its ROFR rights. By referencing some, but not all, of the terms and consideration Sprint failed to address, NACEPF does not waive any right to require Sprint to properly exercise its ROFR rights. NACEPF reserves all of its rights in this regard.

[6/] Tellingly, neither Sprint nor its counsel gave advance notice to NACEPF that Sprint's lawyers had flown to Rhode Island from Missouri to file these papers and appear in the District Court asking for immediate, ex-parte, relief. Sprint and its counsel had known that Edwards Angell Palmer & Dodge, LLP is NACEPF's long-time Rhode Island counsel.

December 26, 2007, NACEPF responded to Sprint's December 18th letter, pointing out that NACEPF was still unable to determine the nature of Sprint's offer (and whether, therefore, it was a proper exercise of Sprint's ROFR rights). Ex. 11. In order to provide clarity regarding Sprint's offer, NACEPF urged Sprint to provide it with a draft lease or a version of the Clearwire lease documents, marked to show the differences between the Clearwire lease and the terms that Sprint was prepared to offer. To date, NACEPF has specifically failed to provide NACEPF with a copy of its own proposed draft lease *or* a copy of the Clearwire Agreements marked so NACEPF could fairly consider Sprint's purported offer, *or* any document describing how Sprint proposed to meet all of the non-cash consideration set forth in the Clearwire Agreements and as is required by the ROFR.

## III. ARGUMENT

To prevail on a motion for injunctive relief, either a temporary restraining order or a preliminary injunction, the Court must find that (1) the movant is likely to succeed on the merits, (2) the movant will suffer immediate and irreparable harm absent the injunction, (3) such harm outweighs any harm to non-movant if the injunction is imposed and (4) the public interest will not be adversely affected. Planned Parenthood v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981). Injunctive relief, equitable in nature, is "' a drastic and extraordinary remedy that is not to be routinely granted.'" Abbott Lab. v. Selfcare, Inc., 17 F. Supp.2d 43, 51 (D. Mass. 1998) (citation omitted); see also, Boston Children's First v. City of Boston, 62 F. Supp.2d 247, 253 (D. Mass. 1999) ("preliminary injunction is extraordinary equitable remedy … the law imposes on movant the substantial burden of convincing the Court" of likelihood of success and irreparable harm). The injunctive relief sought by Sprint is not to be granted "in doubtful cases," on "new" principles or without "caution, deliberation, and sound discretion." Maine Cent. R.R. Co. v.

Bhd. of Maint. of Way Employees, 646 F. Supp. 367, 368 (D. Me. 1986) (quoting 3 Barron & Holtzoff, Federal Practice and Procedure (Wright ed.) § 1431). Under each predicate of this oft-cited standard, Sprint has not and cannot demonstrate that it is entitled to the injunctive relief requested.

**A. Sprint Has Not Shown That It Will Likely Succeed On Any Of Its Claims.**

Of the four factors necessary for a temporary restraining order, the "sine qua non is whether the plaintiffs are likely to succeed on the merits." Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993). Sprint's Verified Complaint fails to establish any likelihood of success on the merits of any of its claims. For this reason alone, this Court should deny Sprint's request for a temporary restraining order.

All of Sprint's claims (for declaratory judgment, injunctive relief, breach of contract and specific performance) depend on Sprint's ability to establish that it timely and properly exercised its ROFR rights. Because Sprint has failed to establish that it timely and properly exercised such rights, it has not met its burden of establishing that it is likely to succeed on the merits of any of its claims.

Any analysis of whether Sprint's ROFR rights were timely and properly exercised begins with the wording of the ROFR. The two contracts at issue contain the same ROFR wording:

> If Lessor and Lessee do not enter into a New Lease Agreement, Lessor grants Lessee a right of first refusal on any competing proposals for lease agreements or transfers or assignments of an part of the ITFS Channels received by Lessor until twelve (12) months after the expiration of the Renewal Term. If any acceptable offer to lease or acquire the ITFS Channels is made to Lessor, Lessor shall give written notice to Lessee describing the person to whom the proposed lease or transfer is to be made, the fees, charges, rental or other consideration to be received for the lease or transfer, the terms thereof and generally the relevant other terms and conditions of the lease or transfer. Lessee shall have a period of thirty (30) days after its receipt of such notice to Lessor, to lease or, if eligible, obtain any or all of the ITFS Channels for the same fees, charges, rental or other consideration for which Lessor proposed to lease or transfer to the third person.

> If the fees, charges, rental or other consideration to be paid by such third person are to be in whole or in part in a form other than cash, the consideration to be paid by Lessee shall be in cash in an amount fairly equivalent to the fair value of the consideration payable by the third person and shall be so stated by Lessee as a sum certain in its notice of election.

See, Verified Compl., Exs. A-B both at 1(C). It is undisputed that on November 6 and 7, 2007, NACEPF sent Sprint timely notices of Clearwire's offers to lease NACEPF's Santa Rosa and Bradenton spectrum. Ex. 6-7. Similarly, there can be no question that as of November 7, 2007 Sprint was aware of all the terms and conditions of Clearwire's offer -- the IUAs specific to Santa Rosa and Bradenton were enclosed with NACEPF's November 6-7, 2007 letters and Sprint was previously provided with the Clearwire Agreements containing the remaining terms of Clearwire's offers to lease spectrum from NACEPF. Ex. 3, 6-7.

Under the terms of the ROFR at issue, Sprint had thirty days from November 6 or 7, 2007 in which to exercise its ROFR and, specifically "to lease … any or all of the ITFS Channels for the *same* fees, charges, rental or other consideration for which Lessor proposed to lease or transfer to the third person." See, Verified Compl., Exs. A-B both at 1(C). Given the nature of the provisions containing the non-cash consideration set forth in the leases at issue (the original leases were nearly 40 pages), the ROFR anticipated that Sprint may not be able to match every non-cash provision of a competing offer. In such instances, if "the fees, charges, rental or consideration to be paid by such third person are … in a form other than cash" Sprint was permitted to substitute a cash equivalent which was to be "stated by [Sprint] as a sum certain" in their notice of election. Id.

Sprint responded with its purported notices of election for Bradenton and Santa Rosa on December 6, 2007. Ex. 8. Instead of agreeing to lease these licenses for the "*same* fees, charges, rental or other consideration" as Clearwire was offering and detailing a sum certain cash

equivalent of those non-cash terms offered by Clearwire, Sprint only mentioned two non-cash items, proposed a cash equivalent for those items only and *completely ignored* other non-cash consideration. Id.

Though it was notified that all the terms of the IUA, MRUA and MRUA-1 were integral parts of the terms offered by Clearwire, and were terms that had to be matched in Sprint's exercise if its ROFR -- either by agreeing to the terms or by offering a cash equivalent, Sprint similarly chose to ignore those terms in its exercise of its ROFR. Worse, Sprint's December 6, 2007 letter specifically stated that it would need to "revise" the terms of the IUA to the extent that it referenced terms in the MRUA or MRUA-1, a clear statement that Sprint had no intention of offering the same terms of the MRUA or MRUA-1, either directly or by a cash equivalent.

Sprint's purported exercise failed to include a number of significant terms and consideration offered by Clearwire, including, but not limited to the following:

- Clearwire's obligation to purchase additional spectrum from NACEPF under certain conditions (a so-called Strategic Opportunity Spectrum Right capacity) (Ex. 4 at §3.10).
- Clearwire's obligation to reset to fair market value the Monthly Royalties upon the occurrence of a disassociation event. (Exs. 6-7, both at ¶10(f)).
- Clearwire's willingness to indemnify NACEPF for certain costs and expenses. (Exs. 4-5 both at Article 9, Exs. 6-7 both at ¶19).
- NACEPF's rights to information regarding Clearwire that is not otherwise publicly available. (Exs. 4-5 both at Article 8, Exs. 6-7 both at ¶20).

While other non-cash consideration is contained in the IUA, MRUA and MRUA-1 and even outlined in correspondence from NACEPF to Sprint, Sprint's attempted exercise of its ROFR rights is silent with respect to these non-cash consideration provisions. Ex. 8.

Sprint's December 6, 2007 letter was an invalid exercise of its ROFR rights under Rhode Island law. When a right of first refusal does not state a price for the exercise of such right when

the right was granted, "the offer of a third party supplies the terms under which the right may be exercised." Kenyon v. Andersen, 656 A.2d 963, 966 (R.I. 1995); see Brito v. Belvedere Developers, LLC, 2004 WL 877565, *4 (R.I. Superior Court 2004) (if a holder of a right of first refusal chooses to exercise his right, he must normally match the price and terms in the competing offer). The leases between Sprint and NACEPF state the conditions under which the ROFR right may be properly exercised. See, Verified Compl., Exs. A-B both at 1(C). Sprint alleges, without support, that the ROFR at issue does not require it to "match all of the terms and conditions of the competing offer deemed acceptable to NACEPF." With the exception of the right to substitute a sum certain in cash for non-cash consideration, the ROFR at issue plainly requires that Sprint's offer contain the *same* terms and conditions as Clearwire's offer. Any other result vitiates the inclusion of the term "consideration" in the ROFR. Consideration is not merely the economic price stated in a contract, it is "the inducement to a contract … the cause motive, price or impelling influence which induces a contracting party to enter a contract." Nolan, Black's Law Dictionary at p. 306 (6th ed. 1990).

In Seessel Holdings, Inc. v. Fleming Companies, Inc., the Western District of Tennessee decided, as a matter of law, that a right of first refusal contained in a shareholder agreement was not properly exercised. 949 F. Supp. 572, 577-78 (W.D. Tenn. 1996). Noting the limited case law available on proper exercise of ROFRs, the District Court looked to case law in different jurisdictions to support its decision. Finding no inconsistency in the case law that requires the exercise of the right of first refusal to be on the *same* terms as the third-party offer, the Court held the exercise in Seessel invalid, noting that "a purported acceptance made within the allotted time, followed by repeated attempts to renegotiate and refusals to enter a contract on the same terms as the third-party offer is *not an effective exercise*" of a ROFR. Id. (emphasis

supplied). The Court went on to note that "the exercise of a right of first refusal obligates the party to enter into and close a deal *on the basis of a pre-existing offer*, any attempt to renegotiate such terms is inconsistent with the exercise" of a ROFR. Id. (emphasis supplied). Sprint's December 6, 2007 attempt to exercise the ROFR at issue in this case, like the purported exercise in Seessel, was an improper exercise insofar as it was an attempt to renegotiate the terms of Clearwire's offer, not an acceptance of those terms (or even, as the ROFR permits, an acceptance of some terms and an offer of a cash equivalent for non-cash terms that Sprint did not want to accept). Even after NACEPF provided Sprint with another opportunity to properly exercise by matching the terms in the Clearwire Agreement, or substituting cash for non-cash terms, Sprint failed to do so, preferring to take its chances in this Court.

**B. Sprint Fails To Show That It Will Suffer Any Irreparable Harm.**

The burden of demonstrating "that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant," in this case, Sprint. Charlesbank Equity Fund II, LP v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004). A showing of irreparable harm is a "necessary threshold showing for an award of preliminary injunctive relief." Id. The well-established definition of irreparable harm states that such harm "most often exists where a party has no adequate remedy at law." Id. Preliminary relief is not warranted by "tenuous or overly speculative forecast of anticipated harm" Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). Here, Sprint has submitted no evidence that it will suffer *any* harm, much less *irreparable* harm absent the relief it seeks. Accordingly, this Court should deny Sprint's motion for temporary restraining order.

Sprint's claim of irreparable harm consists solely of its bald assertions that the loss of NACEPF's Santa Rosa and Bradenton spectrum will be fatal because it is a "unique and

irreplaceable asset" necessary for Sprint's commercial operations in these markets. Sprint's general statements about its need for spectrum are insufficient to demonstrate that its *present* need for the *specific spectrum at issue here*. In fact, Sprint's inability to access the NACEPF spectrum will not affect, in any way, its ability to provide commercial services:

- Sprint has no operational systems in Santa Rosa and Bradenton that are capacity constrained because of Sprint's inability to use NACEPF's spectrum.
- Sprint has offered no evidence that its inability to access NACEPF's spectrum in particular will impede its ability to offer any new or improved service.
- In both Santa Rosa and Bradenton, Sprint already holds licenses for additional spectrum that covers a wider geographic area than the spectrum and the geographic area it would lease from NACEPF and is not presently using that spectrum.

Indeed, Sprint has provided no evidence that it will ever use this or any of the 2.5 GHz spectrum it owns or leases. Sprint's Chief Executive Officer recently resigned, in part, according to press reports, because the company's Board of Directors and major investors questioned his strategy of investing in EBS spectrum, the same type of spectrum at issue here in the Santa Rosa and Bradenton markets.[7/]

Even if Sprint could demonstrate that it has imminent plans to begin to offer services using 2.5 GHz spectrum, Sprint has not demonstrated that its inability to access NACEPF's spectrum in particular will impede its ability to offer service. Contrary to Sprint's assertion that

---

[7/] See, e.g., attached at Ex. 12, Matt Hamblen, *WiMax Plans Moving Ahead at Cisco*, NYTIMES.COM, Dec. 13, 2007 (stating that there have been "doubts raised about whether Sprint Nextel Corp. will continue its ambitious rollout of its Xohm WiMax network nationally next year" and that "Sprint officials said recently that they are studying the possibility of spinning off the Xohm unit and then buying wireless capacity from the new company to resell it"); David Twiddy, *Embarq's Hesse New Sprint Nextel CEO*, ASSOCIATED PRESS, Dec. 18, 2007 (stating that the new CEO "will also have to decide whether to continue a planned commercial rollout next year of the company's Xohm-branded WiMax service"); Marguerite Reardon, *Sprint's WiMax Dilemma*, CNETNEWS.COM, Dec. 20, 2007 ("Wall Street analysts say Sprint's WiMax dreams are an unnecessary and dangerous diversion for the company."); Matt Hamblen, *Industry Veteran Dan Hesse Named New Sprint CEO*, COMPUTERWORLD, Dec. 18, 2007 (stating that the new CEO "probably doesn't even know what Sprint should do about Xohm, as yet"); Carl Gutierrez, *Sprint Nextel Pins Hopes on Hesse*, FORBES.COM, Dec. 19, 2007 (identifying Xohm as the former CEO's "attempt to gain an edge on Sprint's competitors, but it has been criticized as too expensive and unlikely to be profitable").

NACEPF's spectrum is somehow "unique," Sprint in fact already holds licenses or is a party to leases giving it control of approximately 102 MHz of spectrum covering Santa Rosa and approximately 84 MHz in Bradenton.[8/] For Sprint to assert that it will suffer irreparable harm if it does not have immediate access to NACEPF's mere 24 MHz of spectrum in these markets is preposterous -- it is already licensed for more spectrum, over a wider geographic area then the spectrum and the geographic area it would lease from NACEPF -- all for a service it is unlikely to offer in any case.

The loss of an asset that is not presently used or necessary in or order for Sprint to provide services cannot be the basis for Sprint's claim of irreparable harm. Sprint repeatedly states in its Verified Complaint and Memorandum that the spectrum at issue is a unique and irreplaceable asset necessary to provide "wireless services free from interference and otherwise appropriate for commercial use," but Sprint's existing holdings of other spectrum in the same frequency band in these markets completely undermines this claim. Sprint's access to other spectrum in both of these areas would support commercial operations there if Sprint actually proceeds to initiate such operations.

The First Circuit, in Charlesbank, stated that a "finding of irreparable harm must be grounded on something more than conjecture, surmise or a party's unsubstantiated fear of what the future may have in store." 370 F.3d at 162. Instead, "the threat of irreparable harm must be both real and 'immediate.'" Biogen Idec MA Inc. v. Trustees of Columbia Univ., 332 F. Supp.2d 286, 296 (D. Mass. 2004). In Biogen the plaintiffs argued that the termination of their patent license agreements for "the '275 patent" would cause them to be unable to practice

---

[8/] This information is available to the public via the FCC's universal licensing system ("ULS") website http://wireless.fcc.gov/uls/index.htm?job=home. Ex. 13 contains copies of the licenses held by or leased to Sprint or its affiliates that cover either Sonoma County, CA (Santa Rosa) or Manatee County, FL (Bradenton), reprinted from the FCC's ULS website. Where particular frequencies are licensed or leased to Sprint more than once in the relevant geographic area, NACEPF has only counted that spectrum only once in the calculation presented above.

another, separate, patent, known as "the '636 patent." In denying plaintiffs' request for injunctive relief in Biogen, the court found that plaintiffs had not shown irreparable harm even if they lost the right to practice the '637 patent because

> … plaintiffs have never practiced the '637 patent. Nor have they expressed any desire or intention to do so. Therefore, any loss of the right to practice the '636 patent will not, as a practical matter, harm them at all.

Id. at 298. Sprint's claimed harm here -- the loss of the right to lease spectrum it does not use and has no need or immediate intention of using -- is remarkably similar to the harm claimed by plaintiffs in Biogen, the loss of a right to practice a patent it does not use or have an intention of using. As a practical matter, Sprint's loss of the spectrum at issue in Santa Rosa or Bradenton will not cause them any harm at all.[9/] This Court should find, as did the court in Biogen, that Sprint's claim of harm for the loss of a license it does not use cannot meet its burden to show irreparable harm.

Finally, the present case is unlike the Eighth Circuit decision cited by Sprint, PCTV Gold v. SpeedNet, LLC, Case No. 07-2189 (8th Cir. 2007), where the spectrum at issue was to be transferred in an asset sale or joint venture. Here, whatever the outcome, NACEPF will remain the FCC licensee for this spectrum and, in the unlikely event that Sprint does prevail on its claims, NACEPF will bound by any final judgment entered with respect to those claims. Nor is there any FCC rule that would preclude NACEPF's compliance with such a judgment.[10/] Sprint's claims of harm are far too speculative to be the basis for the grant of a temporary

---

9/ The fact that Sprint does not need this spectrum calls into question whether Sprint has an improper anticompetitive motive in seeking to prevent Clearwire from leasing this spectrum.

10/ *See*, *e.g.*, 47 C.F.R. § 1.9030 (only requirement imposed on a licensee with respect to early termination of a lease is to notify the FCC).

restraining order. Ross-Simons of Warwick, Inc, 102 F.3d at 19 ("preliminary injunction not warranted by a tenuous or overly speculative forecast of anticipated harm").

### C. Any Harm That Sprint May Suffer If Injunctive Relief Is Denied Is Greatly Outweighed By The Serious Harm The Defendant Will Certainly Suffer If Injunctive Relief Is Granted.

In contrast to the speculative nature of Sprint's claimed harm, NACEPF will suffer real and immediate harm if the relief sought by Sprint is granted. During the pendency of litigation or arbitration, NACEPF would be deprived of the enhanced revenues it stands to realize from the Clearwire lease. Such a loss would be particularly damaging to NACEPF, a small, non-profit entity providing educational programming. Moreover, a grant of Sprint's request for injunctive relief would embolden Sprint to pursue the same course in other markets where its leases with NACEPF expire. NACEPF is entitled to have its contractual rights enforced without engaging in a drawn out legal battle with Sprint, a large, for-profit public company conglomerate with resources that dwarf NACEPF's. Sprint should not be permitted to force its purported ROFR exercise on NACEPF, and prevent NACEPF from finalizing a lease with Clearwire.

The Santa Rosa and Bradenton markets represent an insignificant percentage of Sprint's overall business, but are a significant part of NACEPF's business. Sprint can afford to use litigation to avoid matching Clearwire's terms to force NACEPF to renegotiate leases with Sprint in an effort to grab spectrum it has no intention of using in the near future. This Court should not provide Sprint with the means to engage in its misguided strategy and should deny the injunctive relief Sprint seeks to aid its strategy.

### D. The Public Interest Will Be Met Only By Denying The Requested Injunctive Relief.

The public interest weighs heavily in favor of denying the relief requested by Sprint. NACEPF agrees that the public interest favors enforcement of contracts and the respect of

parties' expectations with respect to their business agreements, but it is for this very reason that the Court should deny Sprint's attempt to circumvent the ROFR process and frustrate the intentions of the parties.

Moreover, the public has an interest in the use of the spectrum at issue. Spectrum is a public asset, but the result sought by Sprint in its motion would delay the use of the spectrum at issue for the public's benefit by preventing NACEPF from leasing it to an entity with immediate plans to make use of it.

## III. CONCLUSION

For the foregoing reasons, Defendant North American Catholic Educational Programming Foundation requests that this Court DENY Sprint' Motion for a Temporary Restraining Order.

January 8, 2008

Respectfully submitted,

NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.

By their Attorneys,

/s/ Mark A. Pogue
Mark A. Pogue (#3441)
EDWARDS ANGELL PALMER & DODGE, LLP
2800 Financial Plaza
Providence, RI 02903
Tel: (401) 274-9200
Fax: (401) 276-6611
E-Mail: mpogue@eapdlaw.com

/s/ Michael F. Connolly
Michael F. Connolly (*pro hac vice* application pending)
Russell H. Fox (*pro hac vice* application pending)
Sarah B. Herlihy (*pro hac vice* application pending)
Howard J. Symons
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO PC
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
E-Mail: mfconnolly@mintz.com
E-Mail: rfox@mintz.com
E-Mail: sbherlihy@mintz.com
E-Mail: hjsymons@mintz.com